# Fletch Smith and Elisha Short v. Commonwealth.

(Decided December 3, 1926.)

## Appeal from Breathitt Circuit Court.

1. Homicide—Deceased's Statements to Persons Finding Him Fatally Wounded Held Made in Extremis and Admissible as Dying Declaration, if Otherwise Competent.—Where deceased stated to persons who found him after shooting, in condition showing that he had but short time to live, that he could not recover, his statements were made in extremis, so as to be admissible as dying declaration, if otherwise competent.

2. Homicide—Conviction of Murder Held Sustained by Evidence.—Evidence held sufficient to sustain conviction of murder.

3. Homicide—Dying Declaration that Defendants Killed Deceased Held Admissible.—Deceased's dying declaration that defendants killed him, and that, "I saw them right over on the hill there," held admissible in murder trial.

4. Homicide—Evidence of Defendant's Whereabouts Throughout Day and on Night of Killing Held Admissible to Show Motive and Test Accuracy of Their Testimony.—In murder trial, evidence of defendants' whereabouts throughout day and on night of killing, as well as at precise time thereof, held admissible to develop motive and test accuracy of what they testified to as facts.

5. Homicide—Credibility of Dying Declaration, Confession of Another than Defendants, and Latters' Testimony was for Jury.—Credibility of dying declaration, confession of another than defendants, and latters' testimony in murder trial was for jury, whose verdict, sustained by sufficient evidence, will not be disturbed.

A. H. PATTON and A. S. JOHNSON for appellants.

FRANK E. DAUGHERTY, Attorney General, and CHAS. F. CREAL, Assistant Attorney General, for appellee.

Opinion of the Court by Chief Justice Thomas—Affirming.

The Breathitt county grand jury returned an indictment against appellants and defendants below, Fletch Smith and Elisha Short, and Asbury Spicer, charging them with murdering Patrick Howard on June 13, 1925, and which the evidence shows was committed by the perpetrator or perpetrators by waylaying Howard while he was traveling horseback on a public road running up Cane creek in Breathitt county, and shooting him with a shotgun loaded with buckshot, from the effects of which he died. Defendants Smith and Short surrendered, but

it appears that Spicer has never been apprehended. Upon the joint trial of the first two they were convicted and sentenced to serve for their respective lives at confinement in the penitentiary. On this appeal from the judgment pronounced on that verdict, after their joint motion for a new trial was overruled, their counsel contends, (1), that the verdict is flagrantly against the evidence, and (2), that the court erred in the admission of incompetent evidence offered by the Commonwealth, each of which we will discuss in the order named.

1. The deceased resided near the head of Cane fork of the Middle fork of Kentucky river. Seymore Richardson owned and operated a store near the head of Cane creek. Defendant Short resided about 400 yards above that store; while the defendant Smith resided about one-half mile below it, and deceased was killed 2,865 feet up the road from Short's house, between which points, and about 200 yards from the point of the killing, Andy Hollon resided. Farther up the road, some one-half mile or perhaps a mile, deceased resided. About 4:30 in the afternoon of the day of the killing the latter rode horseback to Richardson's store to get some merchandise. In doing so he passed by the house of defendant Short. He tarried at the store some hour or more and was shot while returning home somewhere near six o'clock. At that point there is a bluff on one side of the road and the person who committed the crime fired the shots from behind a cluster of bushes on top of the bluff from a distance of about 22 feet from the deceased as he traveled along the road. The elevation of the perpetrator, because of the bluff, made it necessary for the range of the shooting to be downward at an angle of something near 45 degrees. There were wounds in the head of deceased and in his neck and shoulders. He fell from his horse on the side of the road with his feet up hill.

Not returning that night and his horse being found in front of his house by his wife early next morning, her brother and the brother of deceased started out on a hunt for him and found him about five o'clock lying at the side of the road, with his feet up hill, very bloody but still alive. He stated to those persons that he could not recover, and from his condition it was evident that he had but a short while to live. So that, whatever he said on that occasion, if otherwise competent, was most certainly made *in extremis* so as to be admissible as a dying

declaration. According to those witnesses there was some mud on his lips and dried blood on his face, but he recognized the voice of his brother and called to him and said that he was killed; whereupon the brother inquired how it happened, and then he said in response to a question as to who killed him: "Lish Short, Fletch Smith and Asbury Spicer." The brother then asked him "How do you know?" when he answered: "I saw them right over on the hill there." That conversation was had between the two brothers after the brother-in-law had gone for some water, which deceased called for when they first arrived, but he had previously stated to the brother-in-law before his departure for the water, and which the latter testified to, that Short and Smith were the ones who waylaid and shot him; but the brother-in-law afterwards stated to others that the deceased had implicated in his dying declaration only Short and Spicer, and he gave as a reason for omitting the name of Smith that he was afraid the latter would escape before arrest on account of the fact that he owned no home or property and had nothing to induce him to remain. No such contradiction, however, appears in the evidence of the brother of deceased, who testified more fully to the dying declaration made to him while the brother-in-law was absent.

It was proven by the Commonwealth that about a month before the killing defendant Short, threatened to kill deceased "if he didn't quit fooling with his business," and other witnesses testified that there had been disputes between deceased and Short, who were half-brothers, about the occupancy of and cutting of timber from a tract of land that the two, with other brothers and sisters, inherited from their mother. The deceased died in the road where his body was found, about 30 minutes after it was discovered, as above indicated, and it was shown by the Commonwealth that neither of the convicted defendants went to that place, nor offered any assistance in the removing of the body, nor did they attend the funeral. A Mr. Hollon, who lived at the head of Cane creek, testified that he saw Smith coming down the same road upon which the killing occurred about ten o'clock in the forenoon of that day; while Smith and other defense witnesses testified that he hoed corn the whole of that morning on the farm of Short.

It was shown, and defendants admitted, that they were jointly operating an illicit still over on Howard's

creek, and they testified that at about the supposed time of the killing they left Short's house, each having a shotgun and some other articles, to go to that still, which they claimed they did, but they remained there but a short time and each of them returned to his home, where they spent the night until something near four o'clock the next morning, which was Sunday, and pursuant to agreement and appointment they again met at the still and put it in operation. Later a son of Short came over to the still and informed them of the death of Howard and of accusations in his dying declaration when, according to their testimony, they immediately left the still while yet in operation, returning to their respective homes, and a short while thereafter Smith went from his home to that of Short, where they were seen by the deputy sheriff between 8:30 and 9:00 o'clock; both of them being located in the kitchen of Short's residence. They say that the reason why they did not go to the scene of the shooting or to the place where the body had been removed or to the funeral was because the deputy sheriff suggested to them that it might be dangerous for them to do so.

Defendants and their witnesses, consisting of members of their families only, testified that in the forenoon the two defendants and some of their children, including Ike Short, to whom reference hereinafter will be made, hoed out a patch of corn belonging to the defendant Short, and which they finished at about 10:30 that morning; that the children that afternoon went over on Canoe creek to hoe out another patch of corn belonging to Short and which they finished about 4:30 p. m., and immediately returned home. Smith, after eating his dinner that day, procured his shotgun and returned to the home of Short, from whence, according to their testimony, they expected to go over to their still but were prevented because of a visitor who remained until late in the afternoon. However, that visitor did not appear at Short's until 3 or 3:30 o'clock, between which time and the dinner hour there was nothing to prevent them from carrying out their purpose of visiting the still. Defendants claim that they left Short's house to go to the still some ten or fifteen minutes after deceased passed there on his return home from Richardson's store, and their counsel therefore argue that they could not have gotten to the place of the shooting before deceased passed it. But that argument is based on the absolute accuracy of the

estimated times when the killing occurred and when the defendants left Short's home, both of which are fixed, not by the observance of timepieces, but solely by the estimates of witnesses.   Smith testified that Short's son, who came to the still the next morning, made no statement as to who was accused of doing the killing and that he knew nothing about himself or his codefendant being accused of the crime until much later in the day, and in which he is positively contradicted by Short and the latter's son.   As is usual, some minor contradictions of the witnesses for both sides appear in the testimony, and what we have related is the substance of the testimony for both sides, with the exception of a matter now to be considered.

Ike Short, who is a son of Elisha Short, was about 13 years and 6 months old when the murder was committed.   He was one of those who hoed corn in the forenoon near his father's house and was likewise so engaged on Canoe creek in the afternoon.   He testified at the trial and stated, in substance, that on his return with his brothers and sisters from their work on that afternoon they came into the road that deceased was traveling when killed, and when they got to the orchard at Short's home he stopped to gather some June apples which were about ripe; that while there and near the road the deceased passed down it going to Richardson's store and saw witness in the orchard and, to use the language of the witness, "He said he was aiming to beat me for stealing the gears, and I never stole them; said he was aiming to shoot me and kill me."   He says that enraged him and he went to the house and stated to his brothers and sisters and other inmates that he was going after the cows.   He then procured a shotgun and some cartridges and told his brother he was going squirrel hunting; that he went to the spot at which the murder was committed and stationed himself with the purpose of shooting deceased as he passed up the road going home, and that when he did so he fired the fatal shot, when, to use his language, the deceased "just headed off;" that he then returned home and said nothing to any one about it until the next (Sunday) afternoon, when he told his mother.   She testified that she said nothing to any one about it until a few days before the examining trial when she told her husband, the son stating that he never told anyone but his mother, although he knew

that his father and a near neighbor were accused of the crime. Ike Short was not introduced as a witness at the examining trial, nor at the hearing on the motion for bail after the indictment. The first time he appeared in the case with his confession, or otherwise, was at the trial in the circuit court.

After the examining trial and the hearing on the motion for bail Ike Short broke into a storehouse and was apprehended by the juvenile court and was awaiting his trial on that charge at the time of the circuit court trial. Under the juvenile law he could not be sent to the penitentiary, and, since he was already on his way to the house of reform, it is the argument of the Commonwealth that his confession, made for the first time at the final trial of the prosecution, was evidently false and was manufactured by the father to aid him in his defense, and we must admit that under the circumstances of the case that argument possesses convincing force, especially so when it is remembered that neither at the examining trial nor at the hearing for bail was there any effort made to introduce it. But, after the boy had committed an offense for which he could be sentenced to the house of reform, then the incentive to shield him, at least to some extent, disappeared and then for the first time he is made to tell the story of his own iniquity. He testified that the deceased was wearing a blue serge coat, and he was contradicted on that proposition by all of the other witnesses who testified upon the subject. Besides, an examination of the place from where the shot was fired revealed tracks of a shoe as large as a No. 8 or No. 9 when the witness testified that he was wearing rubber slippers, although his father and others testified that he was barefooted. His story, under the circumstances, is not only unbelievable but to our minds it is a strongly convincing fact that the father who stood indicted for the crime engineered the story for his own benefit after his son would most likely be sent to the house of reform for another offense with which he then stood charged. Upon an entire survey of the case as developed by the record it is clear that it cannot be said to be so flagrantly against the evidence as to justify a reversal on that ground. See McCurry v. Com., 205 Ky. 211, 265 S. W. 630.

2. The only criticism under ground (2) is, (a), the admission of the dying declaration, and (b), some other

minor matters, chief among which was the location of defendants throughout the day of the killing, and that night when, as argued, the only pertinent inquiry was their whereabouts at the precise time of the killing. What we have already said sufficiently discloses the fallacy of objection (a), since it clearly appears that the dying declaration was made *in extremis* and its substance was both competent and relevant. It is equally clear that objection (b) is also without merit. The Commonwealth had the right to investigate the location and whereabouts of both defendants covering the periods in question, not only for the purpose of developing motive but also for the purpose of testing the accuracy of what they testified to as the facts, and to measure that accuracy by the circumstances which such proof might develop.

The jury heard this case and saw the deportment of the witnesses on the stand, with some of whom at least they were no doubt acquainted. It was its right to believe or disbelieve the dying declaration and likewise its right to believe or disbelieve the confession of Ike Short. It was also its duty to not only apply and reconcile many contradictions found in the testimony of defendants, and to account for their unnatural conduct after having learned of the death of Howard, and of their being accused of his murder. It was also called upon to say whether the defendants told the truth when they left Short's home, each armed with a shotgun, on the pretense that they were going to their still for the purposes of operating it and then almost immediately returned, but where they were found early the next morning after each of them, as they say, spent the night at his respective home. In any event it can not be said that there was not sufficient evidence to sustain the conviction, and that being true and no meritorious error being pointed out and none discovered by us, the judgment is affirmed.